ORIGINAL

**CASE UNSEALED PER ORDER OF COURT**

FILED

2016 JUN 16 PM 4:44

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ a.c.c.
DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2016 Grand Jury

| UNITED STATES OF AMERICA, | Case No. **16 CR 1409 H** |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | Title 18, U.S.C., Sec. 371 – Conspiracy; Title 18, U.S.C., Secs. 1341 and 1346 - Honest Services Mail Fraud; Title 18, U.S.C., Sec. 1952(a)(1) and (a)(2) - Travel Act; Title 18, U.S.C., Sec. 2 – Aiding and Abetting; Title 18, U.S.C., Sec. 981(a)(1)(C) and Title 28, U.S.C., Sec. 2461(c) - Criminal Forfeiture |
| HOOTAN MELAMED (1), JEAN FRANCOIS PICARD (2), JOHN PANGELINAN (3), PHONG HUNG TRAN (4), JONATHAN PENA (5), | |
| Defendants. | |

The Grand Jury charges, at all times relevant:

## INTRODUCTORY ALLEGATIONS

1.    Defendant HOOTAN MELAMED was a pharmacist licensed with the state of California.  He operated and was the de facto owner of New Age Pharmaceuticals, Inc., ("New Age") a compounding pharmacy located in Beverly Hills, California.  He also had business interests in other pharmacies, including RoxSan Pharmacy, Inc. ("RoxSan"), Concierge Compounding Pharmaceuticals, Inc. ("Concierge"), Alexso, Inc., and Portland Professional Pharmacy ("Portland Pharmacy") (together, "Melamed's Pharmacies").  These compound pharmacies supplied compound creams and other custom pharmaceuticals to patients.

VHC:nlv(1):San Diego
6/16/16

cc: PRETRIAL

2.   Defendant JEAN FRANCOIS PICARD was a "medical marketer," operating through C.A.S.E., LLC, Versatile Healthcare and Dignity Consultants.   Among the products that he "marketed" were compound creams for Melamed's Pharmacies.

3.   Defendant JOHN PANGELINAN was a "medical marketer" who "marketed" durable medical equipment ("DME") for Company No. 1.   He was the president of Broad Med, Inc.

4.   Defendant PHONG HUNG TRAN was the owner of Coastline Medical Clinics in Southern California. Dr. Tran was previously a licensed physician in the State of California, but had his license suspended after his arrest and indictment by the San Diego District Attorney's Office in January 2016.

5.   Defendant JONATHAN PENA was a "medical marketer" who "marketed" DME for Company No. 1, compound creams for Melamed's Pharmacies, and Magnetic Resonance Image ("MRI" scans) for Company A, a diagnostic imaging facility.   He operated through JP Medical Marketing.

### FIDUCIARY DUTY OF PHYSICIANS

6.   Physicians, including medical doctors and chiropractors, owed a fiduciary duty to their patients, requiring physicians to act in their patients' best interests, and not for their own professional, pecuniary, or personal gain.

### WORKERS' COMPENSATION PROGRAMS

7.   The California Workers' Compensation System ("CWCS") required that employers in California provide workers' compensation benefits to their employees for qualifying injuries sustained in the course of their employment.   Under the CWCS, all claims for payments for services or benefits provided to the injured employee, including

2

medical and legal fees, were billed directly to, and were paid by, the insurer.   The CWCS was regulated by the California Labor Code, the California Insurance Code, and the California Code of Regulations, and was administered by the California Department of Industrial Relations.

8.   CWCS benefits were administered by the employer, an insurer, or a third party administrator.   The CWCS required claims administrators to authorize and pay for medical care that was "reasonably required to cure or relieve the injured worker from the effects of his or her injury."

9.   California law, including but not limited to the California Business and Professions Code, the California Insurance Code, and the California Labor Code, prohibited the offering, delivering, soliciting, or receiving of anything of value in return for referring a patient for goods or services paid for under the CWCS.

10.   The United States offered a workers' compensation program to provide medical care to federal workers who suffer work-related injuries or occupational diseases.   The program was administered by the Office of Workers' Compensation Programs.   Claims are submitted to the Department of Labor for adjudication and payment.

11.   Both California and the federal workers' compensation benefits included prescription medications prescribed by a doctor. Compound creams were specialty medications prescribed for patients who are unable to take medications in their standard formulations (for example, tablets, pills, or injections), for medications that must be absorbed through the skin, or where the specific combination of medicines is not available.   Compound pharmacies could custom-mix the prescribed medicines into a cream to be dispensed to the patient.

3

1    12.  Both  California  and  the  federal  workers'  compensation
2 benefits included DME prescribed by a doctor.  DME was any equipment
3 that provides therapeutic benefits to a patient in need because of
4 certain medical conditions and/or illnesses.  An Inferential Unit
5 ("IF  Unit")  was  a  device  that  provides  low-level  electrical
6 stimulation to a body part to encourage healing.

**Count 1**

**CONSPIRACY TO COMMIT HEALTH CARE FRAUD, HONEST SERVICES MAIL FRAUD AND
VIOLATE THE TRAVEL ACT, 18 USC § 371**

10    13.  Paragraphs 1 through 12 of this Indictment are realleged and
11 incorporated by reference.

12    14.  Beginning on a date unknown to the grand jury and continuing
13 through at least June 2016, within the Southern District of California
14 and elsewhere, defendants HOOTAN MELAMED, JEAN FRANCOIS PICARD, JOHN
15 PANGELINAN, PHONG HUNG TRAN and JONATHAN PENA and others did knowingly
16 and  intentionally  conspire  together  and  with  each  other  and  with
17 others to:

18    a.  commit Health Care Fraud, that is, to knowingly and with the
19 intent to defraud execute a material scheme to defraud a health care
20 benefit  program,  and  to  obtain  by  means  of  materially  false  and
21 fraudulent pretenses, representations, and promises, any of the money
22 and property owned by, and under the custody and control of a health
23 care benefit program, in connection with the delivery of and payment
24 for  health  care  benefits,  items,  and  services,  in  violation  of
25 Title 18, United States Code, Section 1347;

26    b.  commit Honest Services Mail Fraud, that is, to knowingly and
27 with the  intent  to  defraud,  devise  and  participate  in  a  material
28 scheme to defraud and to deprive patients of the intangible right to a

4

1  doctor's honest services, and to cause mailings in furtherance
2  thereof, in violation of Title 18, United States Code, Sections 1341
3  and 1346; and

4      c.  violate the Travel Act, that is, to use and cause to be used
5  facilities in interstate commerce with intent to promote, manage,
6  establish, carry on, distribute the proceeds of, and facilitate the
7  promotion, management, establishment, carrying on, and distribution of
8  the proceeds of an unlawful activity, that is, commercial bribery in
9  violation of California law, and, thereafter, to promote and attempt
10 to perform acts to promote, manage, establish, carry on, distribute
11 the proceeds of, and facilitate the promotion, management,
12 establishment, carrying on, and distribution of the proceeds of such
13 unlawful activity, in violation of Title 18, United States Code,
14 Sections 1952(a)(1) and (a)(3).

15                          **FRAUDULENT PURPOSE**

16     15.  It was the goal of the conspiracy to fraudulently obtain
17 money from health care benefit programs by submitting claims for
18 prescription pharmaceuticals and DME that were generated through a
19 secret pattern of bribes to doctors (and those acting with them and on
20 their behalf), to induce the doctors to refer patients to particular
21 pharmacies and DME providers, in violation of the doctors' fiduciary
22 duty to their patients.

23                           **MANNER AND MEANS**

24     16.  The conspirators used the following manner and means in
25 pursuit of their fraudulent purpose:

26     a.  It was a part of the conspiracy that defendants MELAMED,
27 PICARD, PANGELINAN and PENA, and other co-conspirators, knowing that
28 the payment of per-patient referral fees was unlawful, paid doctors to

5

recommend certain goods and services and refer workers' compensation patients to specific providers for those goods and services, including to pharmacies in which MELAMED had an interest for prescription pharmaceuticals, to Company No. 1 for DME, and to other providers in which the co-conspirators had financial interests for other goods and services.

b.    It was a further part of the conspiracy that defendant TRAN, knowing that receiving a per-patient referral fee was unlawful, agreed to accept per-patient bribes from the co-conspirators to refer workers' compensation patients to companies owned by his co-conspirators or in which they had an interest.

c.    It was a further part of the conspiracy that the co-conspirators paid or accepted specific bribe and kickback amounts for specific kinds of prescriptions, including: between $200-250 per IF Unit referral, $150-200 for each Flurbiprofen cream prescription, $150 for each Gabapentin cream, and $50 per Terocin patch.

d.    It was a further part of the conspiracy that the co-conspirators bribed and solicited marketers and doctors to prescribe compound creams and patches over other types of medications, because these custom pharmaceuticals can be billed at high rates to insurance companies.

e.    It was a further part of the conspiracy that the co-conspirators crafted compound creams and other pharmaceuticals to contain the most expensive components, in order to bill at high rates to insurance companies, instead of customizing the medications to the needs of particular patients.

f.    It was a further part of the conspiracy that the co-conspirators concealed from patients, and intended to cause the

doctors, including Dr. TRAN, to conceal from patients, the kickback and bribe payments made to doctors for referring patients to companies owned by the co-conspirators or in which they had an interest, in violation of the doctors' fiduciary duty to their patients.

g.   It was a further part of the conspiracy that the co-conspirators obscured the true nature of their financial relationships in order to conceal their corrupt payments for patient referrals, including by entering sham agreements to purportedly lease office space or provide marketing services, when in reality the corrupt payments were made in exchange for, or to induce, the referral of patients.

h.   It was a further part of the conspiracy that the co-conspirators, knowing that the payment of per-patient referral fees was unlawful, inserted intermediaries (referring to them as "marketers" or "marketing companies") to hide and obscure the flow of payments from providers to doctors, when in reality the payments were unlawful volume-based, per-patient referral fees.

i.   It was a further part of the conspiracy that the co-conspirators obscured the true nature of their financial relationships in order to conceal their corrupt payments for patient referrals, including by creating separate companies in the names of nominees and straw owners, to pay and receive kickback and bribe money.

j.   It was a further part of the conspiracy that, knowing that per-patient referral fees were unlawful, the co-conspirators disguised their bribes and kickbacks to doctors by providing gift cards, vacations, sports tickets, cash, or patient referrals.

k.   It was a further part of the conspiracy that MELAMED, after paying doctors and marketers kickbacks and bribes to prescribe

compound creams, then filled the prescriptions himself through New Age, or sent those prescriptions to other pharmacies to be filled, including RoxSan, Concierge, or Portland, in exchange for a further kickback from those pharmacies.

l.   It was a further part of the conspiracy that the co-conspirators discussed via telephone calls, emails, and in-person meetings the workers' compensation patients who had been corruptly referred for goods and services in exchange for kickbacks.

m.   It was a further part of the conspiracy that the co-conspirators utilized interstate facilities, including cellular telephones and email, in order to coordinate the referral of patients for goods and services, knowing that such referrals were predicated on unlawful per-patient kickback payments.

n.   It was a further part of the conspiracy that the co-conspirators utilized the mails as an essential part of their fraudulent scheme, including by mailing bills to insurance carriers, and mailing prescription pharmaceuticals and DME to patients.

o.   It was a further part of the conspiracy that co-conspirators billed, and caused insurers to bill, for services provided to patients that the co-conspirators had procured by paying bribes and kickbacks.

p.   It was a further part of the conspiracy that defendants concealed from insurers and patients the material fact of the kickback arrangements, which were in violation of California state law, that led to the referrals.

q.   Using the manners and means described above, defendants submitted and caused to be submitted claims of over $27 million for pharmaceutical prescriptions and over $7.6 million in DME prescriptions procured through the payment of bribes and kickbacks.

**OVERT ACTS**

17.   In furtherance of the conspiracy and in order to effect the objects thereof, the defendants and others committed or caused the commission of the following overt acts in the Southern District of California and elsewhere:

a.   On or about August 9, 2012, in a telephone call, PICARD offered to pay a marketer $125 per compound cream prescription the marketer could get a doctor to prescribe, which would be filled by MELAMED and fraudulently billed to an insurance carrier.

b.   On or about August 20, 2012, PICARD offered to pay a marketer a "guaranteed [$]200 per script" if the marketer could find doctors who would prescribe compound creams to workers' compensation patients, which would be filled by MELAMED and fraudulently billed to an insurance carrier.

c.   On or about December 12, 2012, PICARD offered a marketer a 25 percent kickback of the proceeds on any creams that the marketer could get doctors to prescribe, which would be filled by MELAMED and fraudulently billed to an insurance carrier.

d.   In or about March 2013, PICARD explained to a marketer that the compound creams cost around $20 to produce, but that they could bill the insurance company $3,000 for a "five-pack" of pharmaceuticals that were formulated to contain the highest-priced medications.

e.   In or about March 2013, PICARD suggested that a marketer offer to pay the prescribing doctor between $100 and $150 to prescribe a "five-pack" of prescriptions offered by MELAMED's pharmacy.

f.   In or about March 2013, PICARD directed a marketer to fax compound cream prescriptions to a fax number for New Age.

g.   On or about March 26, 2013, in a telephone call, PICARD requested information about patients that had been procured as a result of a bribe, so that New Age could bill the Department of Labor for prescription pharmaceuticals for those patients.

h.   On or about March 27, 2013, MELAMED caused $4,497.77 to be billed to the U.S. Department of Labor's workers' compensation program for pharmaceuticals that MELAMED had bribed a doctor to prescribe.

i.   On or about March 28, 2013, MELAMED caused $2,613.60 to be billed to the U.S. Department of Labor's workers' compensation program for pharmaceuticals that he had bribed a doctor to prescribe.

j.   On or about March 30, 2013, MELAMED and PICARD and others caused prescription pharmaceuticals that were prescribed due to payment of kickbacks and bribes to be mailed to a location in San Diego.

k.   On or about April 4, 2013, MELAMED and PICARD and others caused prescription pharmaceuticals that were prescribed due to payment of kickbacks and bribes to be mailed to a location in San Diego.

l.   On or about April 11, 2013, MELAMED and PICARD and others caused prescription pharmaceuticals that were prescribed due to payment of kickbacks and bribes to be mailed to a location in San Diego.

m.   On or about May 2, 2013, MELAMED and PICARD and others caused prescription pharmaceuticals that were prescribed due to payment of kickbacks and bribes to be mailed to a location in San Diego.

n.    On or about May 9, 2013, MELAMED caused $10,740.28 to be billed to the U.S. Department of Labor's workers' compensation program for pharmaceuticals that he had bribed a doctor to prescribe.

o.    On or about July 23, 2013, MELAMED and PICARD and others caused prescription pharmaceuticals that were prescribed due to payment of kickbacks and bribes to be mailed to a location in San Diego.

p.    On or about October 17, 2013, MELAMED caused $1,476.00 to be billed to the U.S. Department of Labor's workers' compensation program for pharmaceuticals that he had bribed a doctor to prescribe.

q.    On or about November 26, 2013, MELAMED caused $1,476.00 to be billed to the U.S. Department of Labor's workers' compensation program for pharmaceuticals that he had bribed a doctor to prescribe.

r.    On or about June 24, 2014, PENA gave a doctor gift cards totaling $1,050 in value, in payment for 42 MRI scans that the doctor had referred to Company A.

s.    On or about August 1, 2014, PENA gave a doctor a gift card for $725, in payment for 29 MRI scans that the doctor had referred to Company A.

t.    On or about April 15, 2014, TRAN and PANGELINAN caused Company No. 1 to send a claim for $1,375.31 for DME for patient Michael W., that was referred to Company No. 1 due to payment of kickbacks and bribes, to be sent to an insurance company in San Diego.

u.    On or about August 21, 2014, TRAN and PANGELINAN caused Company No. 1 to send a claim for $1,375.31 for DME for patient Maria H., that was referred to Company No. 1 due to payment of kickbacks and bribes, to be sent to an insurance company in San Diego.

1    v.   On or about August 14, 2014, TRAN and PANGELINAN caused
2  Company No. 1 to send a claim for $1,375.31 for DME for patient
3  Francisco C., that was referred to Company No. 1 due to payment of
4  kickbacks and bribes, to be sent to an insurance company in San Diego.

5    w.   On or about November 29, 2014, MELAMED caused New Age to
6  send to an insurer in San Diego a claim for reimbursement for
7  prescription pharmaceuticals (for patient Edgar M.).

8    x.   On or about December 13, 2014, MELAMED caused New Age to
9  send to an insurer in San Diego a claim for reimbursement for
10 prescription pharmaceuticals (for patient Clara S.).

11   y.   On or about December 13, 2014, MELAMED caused New Age to
12 send to an insurer in San Diego a claim for reimbursement for
13 prescription pharmaceuticals (for patient Fidel V).

14   z.   On or about October 28, 2015, MELAMED paid a marketer a
15 total of $75,810 for 390 compound creams and 331 Terocin patches
16 prescribed in September 2015 by doctors recruited by the marketer or
17 those working with him.

18   aa.  On or about October 29, 2015, PANGELINAN accepted $20,130.50
19 as his share of the kickback paid by MELAMED, for 237 creams and 237
20 Terocin patches that PANGELINAN's doctors prescribed.

21   bb.  On or about November 4, 2015, TRAN asked PENA to send
22 kickback money to a separate marketing company, because TRAN did not
23 want the money going directly to him.

24   cc.  On or about November 4, 2015, TRAN asked PENA to send him a
25 text message that used the code "Let's meet at one [o'clock]" if PENA
26 would pay $100 per compound cream prescription, or "two [o'clock]" if
27 PENA would pay $200.

28

dd.     In November 2015, TRAN and PANGELINAN discussed a bribe payment of over $100 per cream prescribed.

ee.     On or about November 16, 2015, PANGELINAN delivered to TRAN or TRAN's representative a check for $10,000 made out to "Team Enterprise," in payment for 50 IF Units referred by TRAN to Company No. 1.

ff.     On or about November 19, 2015, PANGELINAN accepted a check for $11,565.06 in payment for the DME referrals he had caused doctors to make to Company No. 1 in October 2015.

gg.     On or about November 20, 2015, MELAMED paid a marketer a total of $75,900 for 387 compound creams and 339 Terocin patches prescribed by doctors recruited by that marketer and those working with him in October 2015.

hh.     On or about November 24, 2015, PANGELINAN suggested a new kickback deal with TRAN, to pay TRAN over $100 for each compound cream prescription that TRAN prescribed to MELAMED'S Pharmacies.

ii.     On or about November 24, 2015, PANGELINAN offered to tell doctors that he worked with, including Dr. F and Dr. Y, and their staff, that they should conceal the fact that the doctors were supposed to prescribe a certain amount of DME for the monthly payments received from Company No. 1.

jj.     On or about November 24, 2015, PANGELINAN accepted $17,037.50 as his share of the kickback paid by MELAMED, for 254 creams and 252 Terocin patches that PANGELINAN's doctors prescribed.

kk.     Sometime before December 2015, TRAN and PANGELINAN agreed that TRAN would receive $10,000 per month (disguised as payment for "marketing" services) in exchange for referring 50 IF Units per month to Company No. 1.

1  ll.   On or about December 8, 2015, TRAN said that he would be
2  sending many more DME referrals to Company No. 1, and in order for
3  Company No. 1 to "catch up" on payments due him, TRAN suggested that
4  he only have to refer 40 IF Units per month in exchange for the
5  $10,000 monthly payment from Company No. 1.

6  mm.   On or about December 8, 2015, TRAN and PANGELINAN agreed
7  that TRAN would be paid $125 per compound cream that he prescribed and
8  sent to PANGELINAN, to be filled by a pharmacy designated by MELAMED.

9  nn.   On or about December 15, 2015, PANGELINAN delivered to TRAN
10  or TRAN's representative a check for $10,000 made out to "Team
11  Enterprise," in payment for 50 IF Units referred by TRAN to Company
12  No. 1.

13  oo.   On or about December 17, 2015, PANGELINAN accepted a check
14  for $7,506.34 in payment for the DME referrals he had caused doctors
15  to make to Company No. 1 in November 2015.

16  pp.   In or around December 2015, TRAN started a new marketing
17  company so that he could receive kickback payments.

18  qq.   In or about December 2015, MELAMED agreed to pay $175 per
19  compound cream prescription to a marketer so that TRAN, in turn, could
20  be paid $125 per prescription for prescribing compound creams to be
21  filled by a pharmacy designated by MELAMED.

22  rr.   On or about December 14, 2015, MELAMED paid a marketer a
23  total of $77,900 for 412 compound creams and 314 Terocin patches
24  prescribed in November 2015 by doctors recruited by the marker or
25  those working with him.

26  ss.   On or about December 16, 2015, PANGELINAN accepted
27  $18,462.50 as his share of the kickback paid by MELAMED, for 256
28  creams and 256 Terocin patches that PANGELINAN's doctors prescribed.

1      tt.   On or about January 29, 2016, MELAMED paid a marketer a

2  total of $64,150 for 335 compound creams and 278 Terocin patches

3  prescribed in December 2015 by doctors recruited by the marketer or

4  those working with him.

5      uu.   On or about January 14, 2016, PANGELINAN accepted a check

6  for $8,610.86 in payment for the DME referrals he had caused doctors

7  to make to Company No. 1 in December 2015.

8      vv.   On or about January 14, 2016, PANGELINAN delivered to TRAN

9  or TRAN's representative a check for $10,000 made out to "Team

10 Enterprise," in payment for 40 or 50 IF Units referred by TRAN to

11 Company No. 1.

12     ww.   On or about February 18, 2016, PANGELINAN accepted a check

13 for $12,981.27 in payment for the DME referrals he had caused doctors

14 to make to Company No. 1 in January 2016.

15     xx.   On or about February 29, 2016, MELAMED caused New Age to

16 send to an insurer in San Diego a claim for reimbursement for

17 prescription pharmaceuticals (for patient Edgar M.).

18     yy.   On or about March 1, 2016, MELAMED paid a marketer a total

19 of $54,900 for 273 compound creams and 278 Terocin patches prescribed

20 in January 2016 by doctors recruited by the marketer or those working

21 with him..

22     zz.   On or about March 3, 2016, PANGELINAN accepted $12,768.75

23 as his share of the kickback paid by MELAMED, for 234 creams and 234

24 Terocin patches that PANGELINAN's doctors prescribed.

25     aaa.   On or about March 16, 2016, PANGELINAN accepted a check for

26 $9,469.34 in payment for the DME referrals he had caused doctors to

27 make to Company No. 1 in February 2016.

28

bbb.   In or about April 2016, over telephone conversations and telephone communications, MELAMED agreed to pay a total of $74,300 for 412 compound creams and 250 Terocin patches prescribed by doctors recruited by a marketer or those working with him in March 2016.

ccc.   On or about April 18, 2016, PANGELINAN accepted a check for $10,786.03 in payment for the DME referrals he had caused doctors to make to Company No. 1 in March 2016.

ddd.   On or about April 22, 2016, PANGELINAN accepted $4,050 as his share of the kickback paid by MELAMED, for 162 creams that PANGELINAN's doctors prescribed.

eee.   On or about April 22, 2016, PANGELINAN delivered to a doctor a check for $12,400 in payment for 124 compound creams referred by that doctor to be filled by MELAMED.

fff.   On or about May 13, 2016, PANGELINAN accepted a check for $9,140.29 in payment for the DME referrals he had caused doctors to make to Company No. 1 in April 2016.

ggg.   On or about June 3, 2016, PANGELINAN accepted $10,050 as his share of the kickback paid by MELAMED, for 124 creams that PANGELINAN's doctors prescribed.

All in violation of Title 18, United States Code, Section 371.

## Counts 2 - 12

**HONEST SERVICES MAIL FRAUD, 18 U.S.C. §§ 1341, 1346 AND 2**

18.   Paragraphs 1 through 12 of this Indictment are realleged and incorporated by reference.

19.   Beginning on a date unknown and continuing through at least June 2016, within the Southern District of California and elsewhere, defendants HOOTAN MELAMED, JEAN FRANCOIS PICARD, JOHN PANGELINAN and PHONG HUNG TRAN and others, knowingly and with the intent to defraud,

16

1  devised a material scheme to defraud, that is, to deprive patients of
2  their intangible right to doctors' honest services.

3      20.    Paragraphs 15 and 16 of this Indictment are realleged and
4  incorporated by reference as more fully describing the scheme to
5  defraud.

6      21.    For the purpose of executing the scheme and attempting to do
7  so, within the Southern District of California, the following
8  defendants knowingly caused to be delivered by U.S. Mail according to
9  the direction thereon the following mail matter:

| Ct. | Date | Defendants | Item(s) Mailed |
| --- | --- | --- | --- |
| 2 | 3/30/2013 | MELAMED, PICARD | Prescription pharmaceuticals prescribed due to payment of kickbacks by MELAMED and PICARD |
| 3 | 4/4/2013 | MELAMED, PICARD | Prescription pharmaceuticals prescribed due to payment of kickbacks by MELAMED and PICARD |
| 4 | 4/11/2013 | MELAMED, PICARD | Prescription pharmaceuticals prescribed due to payment of kickbacks by MELAMED and PICARD |
| 5 | 5/2/2013 | MELAMED, PICARD | Prescription pharmaceuticals prescribed due to payment of kickbacks by MELAMED and PICARD |
| 6 | 7/23/2013 | MELAMED, PICARD | Prescription pharmaceuticals prescribed due to payment of kickbacks by MELAMED and PICARD |
| 7 | 4/15/2014 | PANGELINAN, TRAN | Claim of $1375.31 for DME (for patient Michael W.) prescribed by TRAN, for which TRAN and PANGELINAN received kickbacks from Company No. 1 |
| 8 | 8/21/2014 | PANGELINAN, TRAN | Claim of $1375.31 for DME (for patient Maria H.) prescribed by TRAN, for which TRAN and PANGELINAN received kickbacks from Company No. 1 |
| 9 | 11/29/2014 | MELAMED | Claim for prescription pharmaceuticals (for patient Edgar M.) sent by New Age to an insurer |

| Ct. | Date | Defendants | Item(s) Mailed |
|-----|------|------------|----------------|
| 10 | 12/13/2014 | MELAMED | Claim for prescription pharmaceuticals (for patient Clara S.) sent by New Age to an insurer |
| 11 | 12/13/2014 | MELAMED | Claim for prescription pharmaceuticals (for patient Fidel V.) sent by New Age to an insurer |
| 12 | 8/14/2015 | PANGELINAN, TRAN | Claim of $1375.31 for DME (for patient Francisco C.) prescribed by TRAN, for which TRAN and PANGELINAN received kickbacks from Company No. 1 |

All in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## Counts 13 - 14

### TRAVEL ACT, 18 USC §§ 1952 AND 2

22.     Paragraphs 1 through 12 are realleged and incorporated by reference.

23.     Beginning on date unknown and continuing through at least June 2016, within the Southern District of California and elsewhere, defendants HOOTAN MELAMED and JEAN FRANCOIS PICARD knowingly used and cause to be used facilities in interstate commerce with the intent to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of an unlawful activity, that is, bribery in violation of California Penal Code Sections 139.3-32 and California Labor Code Section 3215, and, thereafter, to promote and attempt to perform acts to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of such unlawful activity as follows:

| Ct. | Date | Defendants | Use of Facility in Interstate Commerce | Acts Performed Thereafter |
|---|---|---|---|---|
| 13 | 8/9/2012 | MELAMED, PICARD | Telephone call by PICARD offering to pay $125 per compound cream prescription | PICARD paid a marketer $1,053.53 for 3 sets of compound cream prescriptions filled by MELAMED |
| 14 | 3/26/2013 | MELAMED, PICARD | Telephone call by PICARD to obtain information to fill prescription and bill insurance carrier | PICARD paid a marketer $1,053.53 for 3 sets of compound cream prescriptions filled by MELAMED |

All in violation of Title 18, United States Code, Sections 1952(a)(1), (a)(2) and 2.

## FORFEITURE ALLEGATION

24.   Paragraphs 1 through 12 of this Indictment are realleged and incorporated as if fully set forth herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

25.   Upon conviction of the offenses of Conspiracy, Honest Services Mail Fraud and Travel Act as alleged in Counts 1 through 14, defendants HOOTAN MELAMED, JEAN FRANCOIS PICARD, JOHN PANGELINAN, PHONG HUNG TRAN and JONATHAN PENA shall forfeit to the United States all right, title, and interest in any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of such offenses, including a sum of money equal to the total amount of gross proceeds derived, directly or indirectly, from such offenses.

19

26.   If any of the above described forfeitable property, as a result of any act or omission of defendants HOOTAN MELAMED, JEAN FRANCOIS PICARD, JOHN PANGELINAN, PHONG HUNG TRAN and JONATHAN PENA: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of defendants HOOTAN MELAMED, JEAN FRANCOIS PICARD, JOHN PANGELINAN, PHONG HUNG TRAN and JONATHAN PENA up to the value of the forfeitable property described above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

DATED:   June 16, 2016.

A TRUE BILL:

_____
Foreperson

LAURA E. DUFFY
United States Attorney

By: _____
VALERIE H. CHU
Assistant U.S. Attorney