ALANA ROBINSON
Acting United States Attorney
VALERIE H. CHU
Assistant U.S. Attorney
California State Bar No. 241709
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546- 6750
Fax: (619) 546-0450

Attorneys for Plaintiff
United States of America

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JEAN FRANCOIS PICARD (2),<br><br>　　　　　Defendant. | Case No. 16CR1409-H<br><br>**RESPONSE IN OPPOSITION TO DEFENDANT PICARD'S MOTION TO DISMISS THE INDICTMENT**<br><br>Date:　January 23, 2017<br>Time:　2:00 pm |

The United States, by and through Alana Robinson, Acting United States Attorney, and Valerie H. Chu, Assistant United States Attorney, hereby files this response in opposition to Defendant Picard's Motion to Dismiss the Indictment. As set forth below, the conduct of the government was not outrageous and the motion to dismiss should be denied.

//

//

//

1

# I

# INTRODUCTION

Defendant Picard complains that the government's use of made-up patient information and an allegedly cooperating doctor was outrageous. This is akin to a drug dealer, caught in a "buy-bust" scheme, complaining that the undercover cop isn't actually a drug addict. Nothing about the investigation in this case "shocks the conscience" such that Picard's due process rights were violated. To the extent Defendant is actually claiming that he was a victim of entrapment, he bears the burden of production before he may raise this as a defense at trial. The motion to dismiss should be denied.

# II

# STATEMENT OF THE CASE

## A. PRIOR PROCEEDINGS

On June 16, 2016, a federal grand jury returned a 14-count indictment charging PICARD and his co-defendants with conspiracy, in violation of 18 U.S.C. § 371, honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346, the Travel Act, in violation of 18 U.S.C. § 1952, aiding and abetting, and criminal forfeiture.

The indictment alleges that defendants engaged in a $34 million kickback and bribery scheme through which co-conspirators paid bribes and kickbacks to doctors to write prescriptions for compound creams or make referrals for durable medical equipment, and then to submit them to specific pharmacies and companies to be filled.

As part of the scheme, according to the indictment, Defendant Picard and his co-conspirators paid doctors to recommend certain goods and services, and to refer patients to specific providers for those goods and services. These included compound creams, custom-blended medications that were supposed to be provided to patients who could not tolerate standard medications in pill form. These specialty compounds required a doctor's prescription to specify the exact nature and dosage the patient needed.

The indictment alleges that, to conceal the nature of the illegal kickbacks, Defendant and his co-conspirators inserted intermediaries (calling them "marketers") to

hide and obscure the flow of payments to doctors, disguising the fact that they were unlawful, volume-based, per-patient referral fees. ¶ 16(i). Indictment p. 5, ¶ 16 (a), (c),(d), (e).

Among the overt acts specifically alleged against Picard are the following:

1) On August 9, 2012, Picard offered to pay a marketer ("Marketer 1" or "M1") $125 per compound cream prescription M1 could get a doctor to prescribe.
2) On August 20, 2012, Picard specifically offered to pay M1 a "guaranteed 200 [dollars] per script," referring to compound cream prescriptions.
3) On December 12, 2012, Picard offered M1 a 25% kickback of the proceeds on compound creams that M1 could get doctors to prescribe.
4) In March 2013, Picard explained to M1 that the compound creams cost around $20 to produce, but that they could bill the insurance company $3,000 for a "five-pack" of pharmaceuticals that were formulated to contain the highest-priced medications.
5) In March 2013, Picard directed M1 to fax the prescriptions to a fax number for New Age Pharmaceuticals.
6) On March 26, 2013, Picard called M1 to ask for patient details about the prescriptions supplied by the marketer, so those prescriptions could be billed to the Department of Labor.

See Indictment ¶ 17 (a) – (g).

**B. INVESTIGATION**

Unbeknownst to Picard at the time, the marketer to whom Picard offered to pay $125 and then $200 for prescriptions was cooperating with the government, and recorded their meetings. Also unbeknownst to Picard, the prescriptions that were faxed to the fax number supplied by Picard contained made-up patient information.

But Picard was working on behalf of a real pharmacy. The pharmacy to which Picard had directed the prescriptions be faxed actually filled the prescriptions, and mailed the compound creams to an undercover address (from which federal agents retrieved the

3

pharmaceuticals). After the prescriptions were filled, Picard paid M1 over $1,000 for three prescriptions.

Picard's own words, as reflected over the course of multiple recordings with M1,[1] reveal that Picard was already engaged in ongoing and persistent efforts to pay marketers and doctors. Picard was paying to get doctors not only to write prescriptions, but to refer a veritable smorgasbord of high-cost medical treatments. Picard's conversations with M1 were not characterized by M1 introducing, then recruiting Picard into a new criminal enterprise, but two professionals negotiating how they could do business to their mutual benefit.

For example, in the conversation on August 9, 2012, during which Picard offered the $125 per cream, Picard and M1 discussed a variety of areas for which Picard would be willing to pay for referrals from doctors. This included not only compound creams, but also spinal surgeries. Picard represented that he was already "heavy" into San Diego:

| | |
|---|---|
| M1: | I have guys down in San Diego. You doin' anything down there at all? Can you work anyone down that way? |
| Picard: | I'm pretty heavy down there, yeah. |
| M1: | You're heavy down in San Diego? |
| Picard: | Yeah. |
| M1: | Okay. Alright ahm, you have a surgery center down there or just up in LA? |
| Picard: | Oh I have one in LA, I have one in San Diego. |

In the same conversation, Picard offered to pay the marketer to get a doctor to refer a spinal surgery to the San Diego surgery center he was working with:

| | |
|---|---|
| Picard: | On the, on the facility fee I'm talking about….I'll be able to give you, ah, for a spine [surgery], I'll be able to give you…thirty, on the facility fee. |
| M1: | Thirty on the spine? |
| Picard: | Thirty on the spine, for a PPO [Preferred Provider Organization health insurance], yeah. |

---

[1] These recordings have been provided to Defendant in discovery. The transcriptions presented here are approximate.

4

> M1:       That's a good number.
> Picard:   Yeah.

A few days later, on August 20, 2012, Picard and M1 had a wide-ranging discussion about what Picard would pay for various types of services M1 might be able to get doctors to refer to the San Diego surgery center, including epidurals, knee scope, and breast reduction. They also discussed pain medications. Picard reassured M1, "On P-I [Personal Injury cases], dope and uh, dope and epidural. I'll be able to get us a good deal." [2] M1 asked about the potential payments for that, but Picard shifted to discussing what he was offering for compound cream prescriptions:

> Picard:   I'm talking creams…240 bucks each.
> M1:       Each one?
> Picard:   Each one.

They discussed Picard's connection with a medical group in Florida. M1 asked what Picard was doing for them:

> M1:       So tell me about this group in Florida. What…And what are you doing? All their spine?
> Picard:   Creams.

Picard confided to M1 that he was already doing all of the compound cream prescriptions for the medical group in Florida, and estimated that it was around 2,000 prescriptions. M1 asked if Picard were doing many spinal surgery referrals:

> M1:       Creams? You doin' much spine or no?
> Picard:   [Unintelligible ("UI")] much spine.
> M1:       Really?
> Picard:   [UI] my creams are my savings plan [UI]. Why would I…[3]

---

[2] In this arena, pain treatment often involved epidural injections of pain medication and/or high-priced (and highly addictive) opioid prescriptions ("dope" in common parlance).

[3] The dialogue in this recording is faint in places. This is the best transcription currently available.

5

Picard guaranteed $200 per cream prescription for Workers' Compensation patients. He offered that he could handle 10,000 cream prescriptions, and boasted, "I know for a fact, there's nobody out there that can…touch me with a ten-foot pole" in terms of the price he was offering to pay for the compound cream prescriptions. He disparaged another marketer's offer: "Cream, I've seen, yea, between [$]80 to [$]100, and Katherine's probably gonna tell you she's gonna give you a hundred," but "there's nobody that can, like touch my pricing." He later added, "But yeah, the cream is, is phenomenal…and they [the insurance companies] pay within 15 days. Are you kidding me?"

In a March 19, 2013 conversation Picard encouraged M1 to get doctors to specify high-value medicines in their prescriptions, because, as Picard said, "I pay for what's on the scrip, so."[4] To assist with this, Picard offered to generate a prescription pad for the doctors, pre-printed with the high-value medicines:

> Picard: I'll customize it for his, you know, so all [the doctor] had to do is sign. He doesn't have to fill out all that [B.S.]…

Of course, the "B.S." Picard was referring to were the specific medications the doctor was supposed to be selecting for the patient, that required custom blending into cream form.

Another participant in the conversation ("M2") asked Picard about the volume of Picard's compound cream business:

> M2: I'm just curious. What are you guys grossing annually with all your creams?
> Picard: Monthly or annually?
> M2: Annually.
> Picard: Annually it will be about sixty.
> M2: $60 million?
> Picard: Yeah […] it's been around for a long while…

---

[4] Meaning, Picard would pay more for the prescription if it was written for higher-value medications.

6

Once Picard convinced M1 to give prescriptions to Picard, Picard explained that the prescription pad had a fax number where the prescriptions should be sent. Picard indicated that the prescriptions would go to a pharmacy in Vegas.[5] Picard encouraged the marketers to get their doctors to prescribe a total of five medications, and suggested the amount that should be paid to the doctor, in a way that revealed that he knew how much doctors would accept in exchange for these sorts of prescriptions.

| | |
|---|---|
| M1: | So I think we give the doctor $300 if…if he does all five. |
| Picard: | Oh no. $200. $200. |
| M1: | $200? |
| Picard: | [expletive] yeah. |

Picard suggested that the doctors would be happy to get $200, because they ordinary would receive "[a] buck…150." (referring to $150). Picard confirmed that, for the $200 paid to the doctors, those prescriptions would be billed out at $3,000 to the insurance companies.

All of these conversations occurred before the dates of the transactions with which Picard has been charged in the indictment.

## III

## RESPONSE IN OPPOSITION

### A. USE OF UNDERCOVER TECHNIQUES IS NOT OUTRAGEOUS

To justify dismissal for outrageous conduct, government acts must be "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991). This is an onerous standard. *United States v. Montilla*, 870 F.2d 549, 551 (9th Cir. 1989) ("the alleged outrageous conduct of Government agents is often pleaded, but is very rarely successful"); *United States v. Rogers*, 751 F.2d 1074, 1076-77 (9th Cir. 1985) (dismissal is a "disfavored remedy"). Dismissal is limited to police conduct involving "unwarranted physical, or perhaps mental,

---

[5] Picard subsequently directed the prescriptions be filled by pharmacies in California.

7

coercion" or "those hopefully few cases where the crime is fabricated entirely by the police...." *United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir. 1986), *vacated on other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir.1986). "Because we recognize that 'government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency,' we have [interpreted grounds for dismissal for outrageousness] extremely narrowly." *Montilla*, 870 F.2d at 552, quoting *Bogart*, 783 F.2d at 1438.

Picard has not cited a single case in which a motion for dismissal was actually granted. Indeed, to the contrary, courts have repeatedly held that the government's use of undercover agents or informants, and the use of deception by those agents, does not give rise to outrageous government conduct amounting to a due process violation. In *United States v. Fernandez*, 388 F.3d 1199, 1237 (9th Cir. 2004), cited in Defendant's Motion at page 3, for example, the Ninth Circuit denied a motion to dismiss where the government used an informant who continued to engage in illegal conduct, including conspiring to murder a co-defendant. In *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991), also cited at page 3 of Defendant's motion, the Ninth Circuit held that the government's use of an undercover agent to encourage an 18-year-old patient in a drug-treatment center to deal illegal drugs was not outrageous government conduct sufficient to violate due process. In *United States v. So*, 755 F.2d 1350, 1352 (9th Cir. 1985), the Court denied a motion to dismiss where the government provided the funds and opportunity to launder money. In *United States v. Ross*, 372 F.3d 1097, 1102, 1109-1111 (9th Cir. 2004), the Ninth Circuit affirmed this Court's denial of a motion to dismiss for outrageousness where the government agent illegally procured a green card for an informant who lied on his

8

immigration application, so that the informant could travel internationally to do undercover work. Even where the government contrived a fugitive defendant's expulsion from Panama by revoking his passport and lying to Panamanian police, the Ninth Circuit declined to dismiss for outrageousness. *United States v. Struckman*, 611 F.3d 560, 573-77 (9th Cir. 2010).[6]

The facts of this case fell far short of the conduct described in those other cases – all of which themselves fell short of a showing of outrageousness. Here, after Picard and M1 struck a deal for compound cream prescriptions, law enforcement agents did not supply the true names, dates of births, social security numbers, and medical conditions of real people to Picard, but instead filled prescriptions with made-up information and signed a doctor's name. Like an undercover agent who pretends to be a drug addict, or a vice cop who pretends to be a prostitute, these efforts by law enforcement agents were nothing more than run-of-the-mill undercover operations.

In the absence of any due process violation, a Court cannot use its supervisory powers to dismiss an indictment. *United States v. Simpson*, 927 F.2d 1088 (1991) (although court "was rightfully disturbed by the less-than-exemplary conduct of the

---

[6] In addition to these examples found by Defendant, courts have denied outrageousness challenges involving, among other deceptive acts: the supply of contraband at issue in the offense, *Hampton v. United States*, 425 U.S. 484, 489 (1976); an agent, posing as a physician, who flirted with the defendant (who was a polio victim and needed money for an operation on her legs), who indicated that he would help her obtain medical treatment, and who asked to purchase ten kilos of cocaine from her, *United States v. Montilla*, 870 F.2d 549, 551, 552 (9th Cir. 1989); the commission of equally serious offenses by an undercover agent as part of the investigation, *United States v. Stenberg*, 803 F.2d 422, 430 (9th Cir. 1986); the introduction of drugs into a prison to identify a distribution network, *United States v. Wiley*, 794 F.2d 514, 515 (9th Cir.1986); the assistance and encouragement of escape attempts, *United States v. Williams*, 791 F.2d 1383, 1386 (9th Cir. 1986); use of false identities by undercover agents, *United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir.1984); and an offer to repay a drug debt in the U.S. rather in Colombia and Bolivia that lured luring the defendants into a U.S. jurisdiction, *United States v. O'Connor*, 737 F.2d 814, 817 (9th Cir. 1984).

government, sleazy investigatory tactics alone … do not provide a [clear basis] for exercise of the supervisory power").

Picard's crime was paying illegal kickbacks to a marketer, to get doctors to write certain kinds of valuable prescriptions. Nothing about the specific identity of the patients, or the fact that the prescriptions appeared to be signed by a doctor, changed at all Picard's offer to pay an unlawful kickback to M1.[7]

Simply put, this conduct was not outrageous. It does not shock the conscience. The motion to dismiss should be denied.

## B. DEFENDANT CANNOT SHOW ENTRAPMENT

Instead, what Picard appears to be raising is nothing more shocking or unusual than a run-of-the-mill entrapment defense. An entrapment defense has two related elements: (1) government inducement, and (2) lack of predisposition of the defendant to engage in criminal conduct. *Mathews v. United States*, 485 U.S. 58, 63 (1988). A defendant bears the burden of presenting at least some evidence of both elements in order to put an entrapment defense before the jury. *United States v. Spentz*, 653 F.3d 815, 818 (9th Cir. 2011).

Inducement is the threshold issue in the entrapment defense. Mere solicitation to commit a crime is not inducement. *Sorrells v. United States*, 287 U.S. 435, 451 (1932). Nor does the government's use of artifice, stratagem, pretense, or deceit establish inducement. *Id*. at 441. The Ninth Circuit has explained that a showing of inducement must consist of an opportunity "plus something else – typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternate, non-criminal type of motive." *Spentz,* 653 F.3d at 819 (citation omitted) (rejecting argument that defendants were induced because government proposed the idea of committing the

---

[7] This analysis on these facts is simple and does not necessitate extensive review of the six factors set out, e.g., in *United States v. Pedrin*, 797 F.3d 792, 797 (9th Cir. 2015) to weigh outrageousness in "reverse sting" cases, although such analysis would produce the same result -- that this conduct was not outrageous.

10

robbery, which presented an opportunity to obtain $2.5 million worth of cocaine for relatively minor risk).

The second prong, predisposition, inquires whether the defendant "was an unwary innocent, or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 53.

The Ninth Circuit in *United States v. Mohamud*, 843 F.3d 420, 433 (9th Cir. 2016) suggested five factors to determine whether there was entrapment as a matter of law:

1) The character and reputation of the defendant;
2) Whether the government made the initial suggestion of criminal activity;
3) Whether the defendant engaged in the activity for profit;
4) Whether the defendant showed any reluctance, and
5) The nature of the government's inducement.

Here, there is no record of Picard's character and reputation at the time of his dealings with M1.

As to the second factor, the initial suggestion of criminal activity, Picard argues that he had had no prior dealings with M1. While Picard may not have dealt with M1 before, Picard clearly, by his own admissions, had been paying for compound creams for quite a while by the time he offered to pay M1 $200 per prescription. Picard was familiar enough with the business to know that he paid the highest price among his competitors, how quickly insurance companies paid, and how much doctors would accept. He boasted of handling 2,000 compound cream prescriptions out of Florida, and generating $60 million annually in business. Moreover, Picard was not only paying for cream prescriptions, but was apparently paying doctors and their marketers to refer spinal surgeries, breast reduction surgeries, epidurals, and other procedures to his surgery center in San Diego. Thus, not only the second *Mohamud* factor, but also the third (profit motive) weigh against entrapment.

As revealed by even his own statements, Picard expressed no reluctance to participate in the kickback scheme with M1. In fact, Picard offered that he was "heavy" in San Diego.

Picard encouraged and cajoled M1 to generate cream prescriptions. When M1 persisted in discussing spine surgeries, Picard shifted focus to compound creams. Picard sweetened the deal, increasing the amount of the kickback he was willing to pay from $125 to $200, if M1 could find Workers' Compensation patients. Picard then offered an alternate business arrangement – a 25% cut instead of a fixed amount. In offering an extensive array of amounts and types of kickback payments, it seems it was Picard who was inducing M1 to participate and not the other way around.

Finally, the government did not offer any unreasonable or extreme inducement. M1 was not recruiting Picard into a brand-new kickback scheme, introducing another pharmacy that would pay Picard more, or employing untoward emotional or personal pressure. It was Picard – already overseeing 2,000 prescriptions out of Florida -- who appears to have been trying to convince M1 to submit prescriptions (and a whole host of other procedures) and get paid by Picard for them.

## IV

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Defendant Picard's motion to dismiss the indictment for outrageous government conduct. In the absence of any further showing, the United States moves to preclude Defendant from raising the defense of entrapment at trial.

Respectfully submitted,

ALANA ROBINSON
Acting United States Attorney

DATED: January 13, 2017

s/ Valerie H. Chu
VALERIE H. CHU
Assistant United States Attorney

12

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JEAN FRANCOIS PICARD (2),<br><br>    Defendant. | Criminal Case No. 16cr1409-H<br><br>CERTIFICATE OF SERVICE |

I, VALERIE H. CHU, am a citizen of the United States and am at least 18 years of age. My business address is 880 Front Street, Room 6293, San Diego, California, 92101-8893. I am not a party to the above-entitled action. I have caused service of the **Response and Opposition to Defendant's Motion to Dismiss** on the parties to this case by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 16, 2017.          s/ Valerie H. Chu